```
                                            ┌──────────────────────────────────┐
                                            │ USDC SDNY                        │
UNITED STATES DISTRICT COURT                │ DOCUMENT                         │
                                            │ ELECTRONICALLY FILED             │
SOUTHERN DISTRICT OF NEW YORK               │ DOC #: _____         │
                                            │ DATE FILED: March 1, 2013        │
                                            └──────────────────────────────────┘
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CONGREGATION MACHNA SHALVA
ZICHRON ZVI DOVID,                             :
                                               :
                         Plaintiff,            :
                                               :        11 Civ. 2746 (PAC)
            - against -                        :
                                               :        OPINION & ORDER
                                               :        ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
UNITED STATES DEPARTMENT OF                    :
AGRICULTURE; AUDREY ROWE, in her               :
official capacity as Administrator of the Food and :
Nutrition Service; NEW YORK STATE              :
EDUCATION DEPARTMENT; FRANCES N.               :
O'DONNELL, in her official capacity as         :
Coordinator of the Child Nutrition Program; and :
MAUREEN LAVARE, in her official capacity       :
as Hearing Officer,                            :
                         Defendants.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Congregation Machna Shalva Zichron Zvi Dovid ("Shalva" or "Plaintiff")

instituted this action challenging the denial of its application to participate in the Summer Food

Service Program ("SFSP"), a federally funded, state-administered program which provides free

food to needy children during the summer months.  Shalva asserts two claims against the United

States Department of Agriculture ("USDA") and Audrey Rowe, in her official capacity as

Administrator of the Food and Nutrition Service (collectively, "federal Defendants" or

"Defendants"), contending that (1) Rule 7 C.F.R. § 225.11(c) violates the Administrative

Procedure Act ("APA") because it contradicts its authorizing statute and is "arbitrary and

capricious"; and (2) the rule violates the Regulatory Flexibility Act ("RFA") because the USDA

has failed to conduct periodic review of the rule.  Shalva seeks injunctive relief under 28 U.S.C.

§ 2201 to enjoin the rule's enforcement.  Shalva and the federal Defendants cross move for summary judgment.  There is no basis whatsoever for Shalva's claims against the federal Defendants.  Accordingly, the Court DENIES Shalva's motion for summary judgment and GRANTS the federal Defendants' motion for summary judgment on both claims.

Shalva asserts three claims against state Defendants.  The first two are 42 U.S.C. § 1983 claims.  Specifically, Shalva contends that Frances N. O'Donnell, in her official capacity as Coordinator of the Child Nutrition Program, and Maureen Lavare, in her official capacity as a New York State Education Department ("NYSED") Hearing Officer (1) violated Shalva's Fourteenth Amendment procedural due process rights; and (2) violated 42 U.S.C. § 1761's statutory eligibility requirements.  For both claims, Shalva seeks a declaration pursuant to 28 U.S.C. § 2201 that Shalva "is and was" entitled to participate in the Summer Food Service Program in the 2010 summer.  Shalva's final claim asserts that the NYSED, O'Donnell and Lavare (collectively, "state Defendants" or "Defendants") failed to properly administer federal statutes and regulations in violation of New York's Civil Practice Law and Rules ("CPLR") § 7803.  Shalva requests an order directing O'Donnell and Lavare to reverse their denial of Shalva's application.  The state Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim.  For the reasons below, the Court GRANTS the state Defendants' motion to dismiss all claims against them on Eleventh Amendment immunity and jurisdictional grounds, and does not reach the merits of Shalva's claims.

# BACKGROUND[1]

In 1968, Congress amended the National School Lunch Act to create the Summer Food Service Program ("SFSP").[2]  The SFSP "provide[s] children in areas with poor economic conditions and/or high concentrations of working mothers with a food service program during the summer months . . . ."  H.R. Rep. No. 95-281, at 4 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3517, 3519.  Under the program, the USDA assists states "through grants-in-aid to conduct nonprofit food service programs for children during the summer months . . . ."  7 C.F.R. § 225.1.  State educational agencies are responsible for providing "sufficient qualified consultative, technical, and managerial personnel to administer the Program, monitor performance, and measure progress in achieving Program goals."  7 C.F.R. 225.6(a).  Funding goes to eligible public and private nonprofit service institutions, sometimes called "sponsors," to provide regular food services.  H.R. Rep. No. 95-281, at 4.  States select sponsors based on their ability to meet

---

[1] The federal Defendants' Rule 56.1 statement takes the form of an administrative record that was accepted for certification with Court on December 16, 2011.  The record contains the notice published in the Federal Register of the proposed rulemaking and the final rule as promulgated.  (Dkt. 32, USDA 56.1 ¶ 1.)  Shalva disputes that the documents constitute the entire administrative record due to its omission of a draft impact analysis, a final impact statement, and 86 public comments.  (Dkt. 38, Shalva 56.1 Counterstatement ¶ 1.)  As a result of mandatory retention policies, some of the rulemaking record for this thirty-plus year-old regulation has not been retained.  The USDA has certified that the enclosed documents represent what is now available of the record.  Shalva requested additional discovery to supplement the record by way of interrogatories and depositions.  On February 7, 2012, the Court denied Shalva's request.  (Dkt. 19.)  The existing administrative record provides an adequate basis for effective judicial review of Shalva's APA challenge to 7 C.F.R. § 225.11(c), notwithstanding the ancient matter of the regulatory scheme.  The statute and the implementing regulation are clear.  Nothing in the parties' filings on the present motion suggest any need to supplement the administrative record.

[2] The SFSP is an extension of Congress' earlier enacted school lunch and breakfast programs.  In 1946, Congress enacted the Richard B. Russell National School Lunch Act, *as amended*, 42 U.S.C. §§ 1751-1769c, which granted funding to nonprofit school-lunch programs.  Congress' purpose was to protect the "well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other foods . . . ."  Alcaraz v. Block, 746 F.2d 593, 596 (9th Cir. 1984).  In 1966, Congress supplemented the NSLA with the Child Nutrition Act, *as amended*, 42 U.S.C. §§ 1771-1789, which, among other things, started a school breakfast program.  The SFSP began as a three-year pilot program and extended meal services to school-aged children during the summer months.

3

eligibility criteria contained in federal regulations.  7 C.F.R. 225.6(b)(4).  Sponsors, in turn,

purchase lunches from vendors and distribute them to children at feeding sites.  United States v.

Buigues, 568 F.2d 269, 271 (2d Cir. 1978).

The program had limited success during the period from 1968 to 1973 due in part to a

lack of clarity in the program's rules.  H.R. Rep. No. 95-281, at 4.  In an effort to increase

participation, Congress relaxed the eligibility standards and provided that "any eligible service

institution shall receive the summer food program upon its request."  Pub. L. No. 94-105, 89

Stat. 516 (1975).  The amendment opened the floodgates and led to wholesale abuses by

sponsors.  In 1977, Congress amended the NSLA to provide new and higher eligibility criteria

for sponsor participation in the program.  Pub. L. No. 95-166, 91 Stat. 1325 (November 10,

1977).  The amendment, as it now appears in Section 1761(a)(3), provides:

> "Eligible service institutions entitled to participate in the program shall be limited to
> those that—
> (A)  demonstrate adequate administrative and financial responsibility to manage an
> effective food service;
> (B)  have not been seriously deficient in operating under the program;
> (C) (i) either conduct a regularly scheduled food service for children from areas in which
> poor economic conditions exist; or (ii) qualify as camps; and
> (D) provide an ongoing year-round service to the community to be served under the
> program . . . .

42 U.S.C. § 1761.

The USDA promulgates implementing regulations applicable to the summer food service

program.  The regulation at issue in this case, 7 C.F.R. § 225.11(c) provides:

> "Except as specified below, the State agency shall not enter into an agreement with any
> applicant sponsor *identifiable through* its corporate organization, officers, employees, or
> otherwise, as an institution which *participated in any Federal child nutrition program
> and was seriously deficient* in its operation of any such program."  (emphasis added).

## SHALVA'S CHALLENGES

Shalva challenges the regulation on the basis of two clauses.  First, under the "identifiable through" clause, states may disapprove applicants who can be "identified" as disqualified sponsors through their "corporate organization, officers, employees, or otherwise."  Second, Shalva contests the "cross-disqualification" clause, which defines disqualified sponsors as those who are disqualified under any Federal child nutrition program, including non-SFSP programs. Shalva argues that the regulation exceeds the scope of its enabling statute because Section 1761(a)(3)(B) limits disqualification to deficiencies in the SFSP.  Shalva also contends that 225.11(c) is "arbitrary and capricious" under the APA.

Plaintiff Shalva is a religious corporation which operated a summer camp at 653 Heiden Road, Sullivan County, New York and has participated in the SFSP each summer from 2005 to 2009.  (Shalva 56.1 ¶¶ 3, 4.)  On May 12, 2010, Shalva renewed its application to the NYSED to participate for the summer of 2010.  (Am. Compl. ¶ 21.)  On June 1, 2010, the NYSED informed Shalva that it would need a Section 501(c)(3) determination letter from the United States Department of Treasury before its application could be approved.  (Id. ¶¶ 23, 24.)  Shalva explained that as a church, it did not need to submit, nor could the Treasury Department provide, such a letter.  (Id. ¶  25.)  On June 16, 2010, the NYSED repeated its demand for the 501(c)(3) letter.  (Id. ¶ 26.)  Shalva now contends that it should have received formal notification of the NYSED's decision to approve or deny its application by June 11, 2010.  (Id.)[3]  Discussions of Shalva's not-for-profit status continued through June 2010.  (Id. ¶¶ 27, 28.)

---

[3] 7 C.F.R. § 225.6(B)(3) provides that "[w]ithin 30 days of receiving a complete and correct application, the State agency shall notify the applicant of its approval or disapproval."

Notwithstanding the fact that its application had not been approved, Shalva commenced the SFSP summer program on June 27, 2010, based upon its belief that the parties would resolve the not-for-profit issue and that the NYSED had no other basis for denying Shalva's application. (Id. ¶¶ 36, 43.)  On June 29, 2010, two days after the program started, the NYSED sent Shalva a letter informing it that it would not be eligible to participate in the 2010 summer program because of its failure to prove its not-for-profit status.  (Id. ¶ 30; Fasten Dec. Ex. 1.) Nonetheless, Shalva operated its daily meal service through the summer of 2010, at its own expense, while continuing to discuss its status with the NYSED.  (Am. Compl. ¶¶ 32-35; Shalva 56.1 ¶¶ 9, 10.)

On October 5, 2010, O'Donnell, the Coordinator of the Child Nutrition Program, formally notified Shalva that the NYSED was retroactively denying its application, but for a new and different reason.  (Shalva 56.1 ¶ 11.)  The NYSED stated that Shalva was a part of an organization known as Bobover Yeshiva Bnei Zion ("BZ"), which the New York Department of Health ("NYDOH") determined on June 30, 2010 was "seriously deficient" in the Child and Adult Care Food Program.  (Am. Compl. ¶¶ 44, 45.)  As a result, NYDOH placed BZ on a Child Nutritional National Disqualified List.  (Id. ¶ 44; Fasten Dec. Ex. 2.)  The NYSED's October 5 denial letter stated that the NYSED was treating Shalva and BZ as the "same entity."  (Id.) Applying 7 C.F.R. 225.11's "identifiable through" and "cross disqualification" provisions, the NYSED disqualified Shalva because it was associated with an entity that had been disqualified under another federal nutrition program.  (Fasten Dec. Ex. 2.)

Shalva requested a formal review.  (Am. Compl. ¶ 50.)  At a hearing held on December 14, 2010, the NYSED conceded that Shalva provided adequate documentation for its not-for-profit status and relied instead Shalva's association with BZ.  (Id. ¶ 51; Fasten Dec. Ex. 3 at 4.)

Lavare, the hearing officer, affirmed the denial, determining that Shalva was in fact identifiable as BZ.  (Id. ¶ 52.)[4]

Shalva argues that the state Defendants erred in failing to timely notify Shalva of its termination, in determining that Shalva and BZ were the same entity, and in retroactively denying Shalva's application as of June 27, 2010, the start of the program, based on BZ's subsequent June 30 disqualification.  With regard to the federal Defendants, Shalva argues that 7 C.F.R. § 225.11(c) is invalid under its authorizing statute.

## DISCUSSION

I.   Legal Standard Under the APA

The Administrative Procedure Act authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  Section 706(2), which governs the scope of judicial review, provides, in relevant part, that the court may "set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. 706(2)(A), (C).

 Chevron articulates a two-step framework for determining whether an agency's interpretation of a statute is lawful.  "At the first step, we ask whether the statute's plain terms 'directly addres[s] the precise question at issue.'  If the statute is ambiguous on the point, we defer at step two to the agency's interpretation so long as the construction is 'a reasonable policy

---

[4] In Lavare's hearing order, she found that BZ and Shalva were sufficiently related based on multiple identification criteria in 7 C.F.R. § 225.11(c).  In particular, they shared the same business address in Brooklyn and place of worship, overlapped in several employees (including the secretary of Shalva's board and the executive director), and shared responsibilities for ownership and operation of Shalva's camp in South Fallsburg.  (Fasten Dec. Ex. 3.)

choice for the agency to make.'"  Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 986 (2005) (citing Chevron v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 845 (1984)).[5]

II.  Claim One: The Administrative Procedure Act

The first step of the Chevron analysis directs the Court to consider whether Congress has spoken directly on the issue.  Here, we ask whether 42 U.S.C. § 1761(a)(3)(B) directly addresses cross-disqualification.[6]  At step one of the analysis, courts must employ "traditional tools of statutory construction."  Chevron, 467 U.S. at 843 n.9

A.  Analysis of the Text of 42 U.S.C. 1761(a)(3)(B)

Shalva argues that the Rule fails at Chevron step-one because it directly and unambiguously conflicts with its authorizing statute.  It maintains that Congress clearly intended not to cross-disqualify sponsors because the statute "entitles" sponsors to participate in the program, if they are not excluded by four criteria, one of which is that the sponsor must "not have been seriously deficient in operating under the program."  Since "the program" refers only to the SFSP, 42 U.S.C. § 1761(a)(1)(C), Congress "unambiguously limited disqualification to service institutions that had been deficient in SFSP, not those that may have been deficient in their operation of other NSLA-authorized programs."  (P. SJ. Br. at 12.)  The USDA argues that because 42 U.S.C. § 1761(a)(3)(A)-(D) imposes necessary but not sufficient criteria, it does not

---

[5] "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute . . . .  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 842-43.

[6] Shalva does not argue that the authorizing statute, 42 U.S.C. § 1761(a)(3)(B), addresses "identification" criteria.

foreclose the USDA from imposing additional criteria, such as the cross-disqualification provision.

The Court concludes that 42 U.S.C. § 1761(a)(3)(B) does not directly address the issue. The statute certainly does not explicitly prohibit the USDA from adopting cross-disqualification. Barnhart v. Walton, 535 U.S. 212, 218 (2002) (holding that Congress has spoken when "the statute unambiguously forbids the [a]gency's interpretation"); Chauffeur's Training Sch., Inc. v. Spellings, 478 F.3d 117, 126 (2d Cir. 2007) (analyzing Chevron step one as whether Congress clearly intended to prohibit agency action).

The text of the authorizing statute, 42 U.S.C. § 1761(a)(3), disqualifies from SFSP those who were "seriously deficient" in operating that program, without addressing a sponsor's deficiencies in other similar food and health programs. Shalva emphasizes the word "entitle," which it argues, automatically enables eligible SFSP sponsors to participate in the program. The USDA focuses on "eligible," which it insists means that sponsors have satisfied preconditions enumerated in the statute but does not obligate the state agencies to approve them. It is not clear (i.e., it is silent) where Congress has placed its emphasis. Further, the language is "silent" within the meaning of Chevron insofar as it does not expressly refer to cross-disqualification, and fails to define "entitle" and "eligible."

B.  Other "Traditional Tools of Statutory Construction"

When considering whether Congress has unambiguously spoken, courts may also rely on "interpretive clues," first by looking to canons of statutory construction, and if Congress' intent is still unclear, to legislative history.  Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 116 (2d Cir. 2007).

The legislative history of the 1977 amendments supports the conclusion that Congress did not specifically intend to limit sponsor eligibility criteria to those enumerated in 42 U.S.C. § 1761(a)(3).  Congressional hearing testimony and the House Report accompanying the 1977 amendments make evident that Congress intended for its legislation to combat widespread fraud and abuse in the program.  The notion that Congress sought to *limit* the grounds for disqualification e.g., make it *more difficult* to disqualify fraudulent sponsors, is incompatible with this purpose.  Shalva's interpretation would recreate many of the problems which caused Congress to act in 1977.

The purpose of the 1977 amendments was to "achieve greater accountability for program funds, and eliminate abuses that have plagued the program in the past."  H.R. Rep. No. 95-281, at 1-2.  In 1975, Congress relaxed the sponsor eligibility criteria for the SFSP to increase participation in the program.  Participation rose, but so did "waste, mismanagement, and other abuses of the Federal laws and regulations governing the program . . . ."  Id. at 5.  At oversight hearings conducted by the Subcommittee on Elementary, Secondary, and Vocational Education in 1976, state administrators attributed program abuse to being "forced to approve sponsors . . . because the USDA had not been restrictive enough in its eligibility criteria . . . ."  Id. at 6.  Similarly, the USDA testified that the legislation governing the program was "too open-ended, and this led to lack of control at any administrative level."  Id.  There is no doubt that when Congress amended the Summer Food Act in 1977, it intended to tighten eligibility controls.  Shalva's argument that Congress restricted the USDA's discretion to disqualify sponsors to those enumerated grounds in the statute is not consistent with Congressional intent and purpose.

This intent is corroborated by Congress' removal of entitlement-creating language in the 1977 amendment.  Testimony before the subcommittee in March 1977 reported that states were

erroneously interpreting the sentence in the 1975 Act providing that "any eligible service institution shall receive the summer food program upon its request" to mean that states were required to approve every applicant.  *National School Lunch and Child Nutrition Act: Hearing before the H. Subcomm. on Elementary, Secondary, and Vocational Education of the H. Comm. On Education and Labor* (1977) (statement of Henry Schwege, Director, Community and Economic Development Division, General Accounting Office) [hereinafter Hr'g], at 514.[7]  It was proposed that "Congress should make it clear that the law does not require mandatory approval of every service institution that applies."  Id. at 515.

Contrary to Shalva's contention, the addition of "entitle" in the 1977 amendment does not clarify the provision.  In 1975, Congress described its eligibility criteria in the context of "service institutions *eligible to participate* under the program."  Pub. L. No. 94-105, 89 Stat. 516.  In 1977, Congress changed its description to "eligible service institutions *entitled to participate* in the program."  Pub. L. No. 95-166, 91 Stat. 1326.  Shalva argues that the natural interpretation of this insertion is that Congress intended that "eligible" sponsors are automatically "entitled."  This interpretation however cannot be reconciled with Congress' simultaneous removal of language that equated eligibility with entitlement.  Further, Congress imposed more stringent eligibility criteria, requiring for the first time that service institutions not be "seriously deficient."  These

---

[7] "In prior years this provision created the impression among some states that all nonprofit service institutions that apply are automatically eligible."  Id.  "The wording in the law has been interpreted by States as requiring them to accept every service institution that applies for the program."  Hr'g at 524.  In addition, as the Committee on Education and Labor noted in the House Report, concerns were raised specifically associating abuse in the program with that sentence in Section 13(a)(1).  H.R. Rep. No. 95-281, at 14 ("The committee . . . does understand the problems created by the present law and seeks to correct those problems by proposing to delete the sentence stating that any eligible service institution must be approved upon its request.").

changes reflect a rejection of the 1975 "liberalization" of SFSP's policies, which caused an increase in abuse, in favor of the adoption of more restrictive policies.  H.R. Rep. 95-281, at 4-5.

If anything, the text of the statute and its legislative history lead to the conclusion that the sponsor eligibility criteria described in 42 U.S.C. § 1761(a)(3)(A)-(D) do not preclude the promulgation of further regulatory criteria.

III. <u>Chevron</u> Step-Two: Is Rule 225.11(c) "Arbitrary and Capricious" Under the APA?

Since 42 U.S.C. § 1761(a)(3)(B) itself does not "directly address" the issue of cross-disqualification, the Court turns to whether the USDA's regulation is a reasonable one or "arbitrary and capricious."  It does so in the context of affording <u>Chevron</u> deference.  <u>See</u> <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 43 (1983).  An agency's construction is not "arbitrary and capricious" unless "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  <u>Id.</u>

An agency's interpretation qualifies for <u>Chevron</u> deference when Congress has delegated authority to the agency to make rules carrying the force of law, and the interpretation was promulgated in the exercise of that authority.  <u>United States v. Mead</u>, 533 U.S. 218, 226-27 (2001).  Here, Congress has vested the USDA with broad rulemaking authority to implement the SFSP.  <u>See</u> 42 U.S.C. § 1779(a).[8]  Further, deference due is at the "high end of the spectrum"

---

[8] Plaintiff disputes the breadth of power that Congress delegated to the USDA.  It asserts that 42 U.S.C. § 1779 only provided interpretative power to the USDA, not legislative or rulemaking authority by way of the notice-and-comment procedure in § 553.  It is clear, however, that in Section 1779, Congress delegated rulemaking authority, and that this broad grant warrants deference.  <u>See</u> <u>Haddon Twp. Board of Ed. v. New Jersey Dep't of Ed.</u>, 476 F. Supp. 681, 692 (D.N.J. 1979) ("Congress has delegated rulemaking authority to the Secretary of Agriculture . . . .

when the interpretation "is not merely ad hoc but is embodied in a duly promulgated regulation, which is applicable to all cases." <u>Spellings</u>, 478 F.3d at 129.  Such is the case here as the challenged rule, Section 225.11(c), takes the form of a generally applicable, duly-promulgated regulation.  Courts also afford more deference to regulations of longstanding duration.  <u>Barnhart</u>, 535 U.S. at 219-220.  Section 225.11(c) has existed for more than 30 years since it was first promulgated in 1981.

    A.  The "Cross-Disqualification" Clause

The cross-disqualification clause in 7 C.F.R. 225.11(c) is rational in light of the policy of the enabling legislation to curb abuse in the SFSP.  H.R. Rep. No. 95-281 (1977), at 1-2.  With the 1977 amendment, Congress sought to "eliminate abuses that have plagued the program in the past." <u>Id.</u>  Cross-disqualification excludes from the SFSP those who have "serious deficiencies" arising out of their performance in other nutrition programs.  The USDA's assumption that these are repeat offenders likely to commit the same infractions in the SFSP, is a rational one, and reasonably effectuates Congress' purpose.

Shalva argues that the USDA failed to provide a reasoned explanation for establishing the cross-disqualification provision.  But the answer is obvious.  The summer lunch program is designed to continue the benefits of the well-established school nutrition program when schools are closed for the summer.  It makes good sense to require that program participants not be seriously deficient in their operation of other programs as a condition of participating in the SFSP.  There is no justification and no reason for allowing those sponsors who were deficient in child nutrition programs to participate in the SFSP.

---

[which is a] broad delegation . . . .") (citing 42 U.S.C. 1779); <u>see</u> <u>also</u> <u>Charette v. Bergland</u>, 457 F. Supp. 1197, 1203 (D.R.I. 1978).

Even if an explanation were required, the explanation offered by the USDA is more than sufficient. The agency does not have to "demonstrate to a court's satisfaction that the reasons for the new policy are *better than* the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes it* to be better, which the conscious change of course adequately indicates." FCC v. Fox TV Stations, Inc., 129 S. Ct. 1800, 1811 (2009) (emphasis in original). Here, the USDA's cross-disqualification regulation was a conscious change for the better.[9] The USDA explained that the requirements would "assist State agencies in reducing Program mismanagement and abuse." 45 Fed. Reg. 74384, AR 02.[10] The explanation is in full accord with the legislative history evidencing a Congressional intent to reduce fraud in the program.

Shalva insists that the fraud cited as supporting the 1977 amendments does not correspond to the need for further restrictions adopted in 1981, three years later, and in the form of cross-disqualification specifically. The Court is not required to conduct such a searching review into whether an agency's chosen method of combating fraud, e.g., cross-disqualification, was narrowly tailored to address a specific need to eliminate cross-program abusers. Presented with evidence of persisting fraud in the SFSP after Congress enacted the 1977 amendments, including reports of continued sponsor fraud, the USDA determined that cross-disqualification

---

[9] The USDA explained this change the text of the provision in the following way: "The proposed rule *changes the provision in several ways*. First, prior regulations have only stated that serious deficiencies in the operation of the Program are grounds for disapproval of applications. The proposed rule makes it clear that serious deficiencies in the operation of any Federal child nutrition program are grounds for disapproval and are also grounds for the termination of sponsors which are operating the Program." Summer Food Service Program For Children, 45 Fed. Reg. 74384, 74388 (Nov. 7, 1980) (emphasis added).

[10] See also 46 Fed. Reg. 6266 (Jan. 21, 1981) "The final rule spells out new corrective action requirements for State agencies dealing with meal service violations at the site level. These requirements will assist State agencies in reducing Program mismanagement, waste and abuse."

would help to ameliorate and reduce this abuse.[11]  The Court cannot substitute its own judgment

for that of the USDA as long as the regulations are not arbitrary and capricious.  State Farm, 463

U.S. at 43.  They are not.  The USDA's regulations are rational, find support in the record, and

entirely consistent with the enabling statute.

### B. The "Identifiable Clause"

Shalva argues that the "identifiable clause" of 225.11(c) is arbitrary and capricious

because it is inconsistent with 225.6(b)(9).  225.6(b)(9) refers to "any applicant sponsor

identifiable through its organization or principals," while 225.11(c) refers more broadly to

"corporate organization, officers, employees, or otherwise."[12]  The identification criteria do not

contradict each other.  Indeed, there is a clear directive about which criteria to follow: section

225.6(b)(9) cross-references section 225.11(c).  225.6(b)(9) provides that states shall not approve

any applicant sponsor "identifiable through its organization or principals as a sponsor which has

been determined to be seriously deficient *as described in § 225.11(c)*."  To the extent that there

is any difference in criteria, the regulation directs that 225.11(c) be followed.

Shalva also argues that the identification clause is arbitrarily vague because the phrase

"or otherwise" does not meaningfully limit the rule's reach and essentially allows states to

disqualify sponsors based on "minimal connections" with deficient sponsors.  (P. Opp. at 19.)

Use of the term "or otherwise" does not render a regulation vague.  See United States v. Farinas,

---

[11] *See, e.g.*, Report by the Comptroller General of the United States, *The Summer Feeding Program for Children: Reforms Begun, Many More Urgently Needed*, at 5 (Mar. 31, 1978), available at http://www.gao.gov/assets/590/589913.pdf; Report to the Congress of the United States by the Comptroller General, *Efforts to Control Fraud, Abuse, and Mismanagement in Domestic Food Assistance Programs: Progress Made–More Needed*, at 24-25 (May 6, 1980), available at http://www.gao.gov/assets/130/129407.pdf.

[12] The rest of 7 C.F.R. § 225.6(b)(9) reads in relevant part: "The State agency shall not approve the application of any applicant sponsor identifiable through its organization or principals as a sponsor which has been determined to be seriously deficient as described in § 225.11(c)."

308 F. Supp. 459, 466 (S.D.N.Y. 1969).  Regulations are vague only when they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and fail to "provide explicit standards for those who apply them."  See Piscottano v. Murphy, 511 F.3d 247, 280 (2d Cir. 2007).  The phrase "or otherwise" does not give unfettered discretion to state agencies to disqualify based on just any association between two entities, but rather refers to organizational identifiers similar to those enumerated before it.[13]

The definitional content of the identification clause can be discerned from the regulation itself: corporate organization, officers, and employees are all criteria that touch on corporate form.  Far from being arbitrary, these criteria appear in almost identical terms in the legislative history of the 1977 amendment to the SFSP.  On March 23, 1977, Congresswoman Holtzman submitted testimony to the subcommittee recommending that where new sponsors are "affiliated, through officers, directors, chief employees, or otherwise, with a prior sponsor, new sponsor[s] [should be] evaluated, to the extent appropriate, in light of the former's performance."  Hr'g at 545.  The purpose of identifying related entities is "to assure that earlier unsatisfactory sponsors or their principals do not simply reappear in new corporate guises , . . ."  Id. at 555.  The USDA's criteria are not overbroad.  The need for some flexibility is obvious and reasonable—it is impracticable to list every conceivable way that entities are related.  The determination of whether a deficient sponsor has simply "reappeared" is necessarily a fact-specific inquiry.  At the same time, the regulation provides sufficient notice to entities that share the same corporate organization, officers, employees, or other similar identifiers, that their association may risk their termination from the program.

---

[13] "Under the rule of *ejusdem generis*, where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated."  Harrison v. Ppg Indus., 446 U.S. 578, 586 (1980).

Shalva voices particular objection to "employee" as a criterion in 225.11(c). It concedes that hearing testimony supporting the amendment suggested taking into account the affiliations among "chief employees," but maintains that any "employees" casts too wide a net and does not further the Congressional intent of reducing waste and fraud in the program. (P. S.J. Br. at 21.) First, Shalva has mischaracterized the legislative history, which also supports a broad disclosure of the "[n]ames and salaries of *all* current *employees*, officers and directors," and requires the same disclosure if the sponsor has operated a program within a prior three-year period. Hr'g at 546, 555. It would be pointless to require such disclosure if state agencies could not take that information into account when assessing sponsors' qualifications. Second, the USDA's determination that employing broad-based identification criteria would promote sponsor accountability is not arbitrary and capricious. It is not difficult to imagine that a corporate entity could "reappear" without an overlap in officers, directors or other high-level operators. See id.

Shalva points out that the identification criteria were changed several times without a reasoned analysis. As initially promulgated in 1977, an entity would be disqualified as seriously deficient if "identifiable through its corporate or other organization or otherwise." 42 Fed. Reg. 11811, 11814 (March 1, 1977). The USDA broadened the Identification Clause in 1981 when it changed the criteria to any sponsor "identifiable through its corporate organization, officers, employees, or otherwise." 46 Fed. Reg. 6266, 6284 (January 21, 1981).[14] To the extent that Shalva is arguing that each textual change required a "reasoned analysis" under State Farm, Shalva's argument is unavailing. Shalva has not demonstrated a settled course of behavior or

---

[14] Shalva argues there was an interim change in 1978, which disqualified any sponsor as deficient, if "identifiable through its organization or principals." The Court has been unable to uncover this version as reported by Shalva. The 1978 rule mirrors the 1977 version in that it disqualified on the basis of "corporate or other organization or otherwise." 43 Fed. Reg. 13020, 13023 (March 28, 1978); Scharf Dec. Ex. C.

prior policy on which sponsors relied, e.g., an agency practice prior to 1981 of condoning the

approval of entities associated with deficient sponsors through an overlap of employees.  In fact,

the textual change is not inconsistent with prior versions of the rule, which incorporated the

catch-all "or otherwise" that could have included the "employee" identifier.

IV. Claim Two: The Regulatory Flexibility Act

When agencies propose or promulgate rules, the Regulatory Flexibility Act requires them

to engage in "regulatory flexibility analysis" and periodically review the rules.  5 U.S.C. §§

603(a), 604, 610(a).  If the head of the agency certifies that the rule will not affect small entities,

however, then the requirements are not applicable.  5 U.S.C. § 605(b) ("Sections 603 and 604 of

this title shall not apply to any proposed or final rule if the head of the agency certifies that the

rule will not, if promulgated, have a significant economic impact on a substantial number of

small entities.").  The agency shall "publish such certification in the Federal Register at the time

of publication of general notice of proposed rulemaking for the rule or at the time of publication

of the final rule, along with a statement providing the factual basis for such certification."  Id.  In

1989, the USDA reorganized 7 C.F.R. Part 225 (the SFSP) and made minor revisions to

provisions that are not at issue here.  As part of the final rule, which was published in the Federal

Register, the agency certified that the rule did not have a significant economic impact on a

substantial number of small entities.  See 54 Fed. Reg. 18200 (April 27, 1989).

Shalva argues that the 1989 certification does not apply to the challenged provisions

because "the certification of the Acting Director was of the impact of the 1989 changes, which

simply reorganized and clarified 7 C.F.R. Part 225" and did not include substantive changes to

the cross-disqualification clause and the identifiable criteria.  (P. Opp. at 24.)  Shalva does not

cite any authority, and the Court has found none that suggests that the 1989 certification is not

also effective as to non-substantive amendments.[15]  The text of the certification itself appears to embrace all of the provisions contained therein, including 225.11(c): "[t]his *final rule* has . . . been reviewed with regard to the requirements of the Regulatory Flexibility Act . . . .  Mr. G. Scott Dunn, the Acting Administrator of the Food and Nutrition Service, has certified that *this rule* does not have a significant economic impact on a substantial number of small entities."  54 Fed. Reg. 18200 (emphasis added).  The Court finds that the 1989 certification is adequate, and therefore no periodic review is necessary.  5 U.S.C. § 605(b).

Shalva argues that the certification is ineffective for the additional reason that it was not published at the time Rule 225.11(c) was first promulgated.   Section 605(b) requires that the agency "shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule *or at the time of publication of the final rule* . . . ." (emphasis added).  The section does not distinguish between original promulgations and subsequent reorganizations.  Since the 1989 certification applies to 225.11(c), the certification was properly published at the time the final rule was published, on April 27, 1989.

Finally, Shalva's quibble is time-barred.  Under the Regulatory Flexibility Act, Shalva had one year as of "final agency action" to bring its cause of action.  The USDA made its certification on April 27, 1989; Shalva had one year as of this date to bring its claim.  See Valentine Props. Assocs., LP v. United States HUD, 785 F. Supp. 2d 357, 369 (S.D.N.Y. 2011) (quoting 5 U.S.C. § 611(a)(3)(A)).  Accordingly, Shalva's claim under the RFA is dismissed.

V.  Shalva's Section 1983 Claims Against State Employees O'Donnell and Lavare

---

[15] Shalva cites other agency final rules attributing the lack of any significant economic impact to the previous implementation of its provisions.  E.g., 65 Fed. Reg. 82246, 82250 (Dec. 28, 2000) ("Since the provisions contained in this rule were previously implemented, it will have no impact.").  But this language is not contained in 54 Fed. Reg. 18200.  There is no evidence that the Acting Director did not review 225.11(c) in its certification.

Shalva asserts two Section 1983 claims against O'Donnell and Lavare for violations of the Plaintiff's Fourteenth Amendment due process rights and 42 U.S.C. § 1761.  In addition, Shalva seeks a declaratory judgment that it was entitled to participate in the SFSP in the summer of 2010, (Am. Compl. ¶¶ 92, 99), as well as an injunction reversing the NYSED's October 5, 2010 decision to exclude Shalva from the SFSP (id.).

Shalva's requested injunction would require the NYSED to provide Shalva with the funds it expended in running the 2010 program.  State Defendants contend that the Eleventh Amendment bars Plaintiff's claims.  They argue that Ex Parte Young's exception, which permits suit for prospective, injunctive relief for continuing violations of federal law does not apply here because Shalva seeks retrospective payment.

"The Eleventh Amendment prohibits suits against a state or one of its agencies in federal court absent the state's consent or a valid abrogation of its sovereign immunity by an act of Congress."  Rothenberg v. Stone, 234 F. Supp. 2d 217, 221 (E.D.N.Y. 2002) (citing Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100-01 (1984)).  Ex Parte Young provides an exception to immunity, and permits suits to proceed against state officers in their official capacities if two conditions are satisfied: "[the] complaint (a) 'alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.'"  Deposit Ins. Agency v. Superintendent of Banks (In re Deposit Ins. Agency), 482 F.3d 612, 618 (2d Cir. 2007).

Shalva concedes that it is seeking retrospective relief.  Relying on the principle articulated in Edelman v. Jordan, 415 U.S. 651, 664-65 (1974), it contends that the Eleventh Amendment does not bar retrospective damages if the funds are not paid from the state

treasury.[16]  The Court need not reach the issue of whether retrospective relief is permissible if

drawn from non-state sources, however, because any monetary judgment in this case would

come from the state treasury.  Federal regulations require the NYSED to return unused federal

funds allocated for the SFSP by September 30 of each fiscal year.  See 7 C.F.R. § 225.5(d)(6).

Presumably, the NYSED has any returned remaining 2010 SFSP funds; any judgment would

deduct (at least temporarily, and possibly permanently) from the state treasury.  An order

awarding Shalva any SFSP funds would direct the state to parcel out funds currently under its

control, thus interfering with the state's fiscal autonomy.  See Boyland v. Wing, 487 F. Supp. 2d

161, 182 (E.D.N.Y. 2007).

Even if, as Shalva contends, the court were to consider possible federal reimbursement in

determining whether Eleventh Amendment immunity applies, where reimbursement is uncertain

and contingent, the Eleventh Amendment still bars claims against state agencies and their

officials.  See McGuire v. Switzer, 734 F. Supp. 99, 107 (S.D.N.Y. 1990) ("Since there is no

guarantee that the State will be fully reimbursed for any expenditure on plaintiffs . . . were this

Court to grant the retroactive monetary relief requested by plaintiff, funding would very well

have to come from the state treasury.  The Eleventh Amendment cannot be disregarded based on

such contingencies.").[17]  It is far from certain that the federal government would reimburse

NYSED for retrospective payments.  As 2010 funds were required to be returned, the FNS must

specifically grant an exception to disburse funds in response to sponsors' requests.  7 C.F.R. §

---

[16] In Edelman, Supreme Court held that a federal court's remedial power is "limited to prospective injunctive relief .
. . and may not include a retroactive award which requires the payment of funds *from the state treasury*."  415 U.S.
at 677 (citations omitted) (emphasis added).

[17] Harrington v. Blum, 483 F. Supp. 1015 (S.D.N.Y. 1979) is not to the contrary.  The court found that the federal
government, by law, was required to reimburse the state for erroneous denials.  Thus, reimbursement was certain
and not contingent in that case.

225.5(d)(5).[18]  Shalva argues that under the funding scheme, "[s]tate reimbursements to sponsors are paid either from a line of credit exclusively dedicated for SFSP benefits, or directly by the . . . FNS.  SFSP funds never enter the state treasury."  (P. Opp. at 16 (citing 7 C.F.R. § 225.5(d)(1)-(5).)  While it may be the case that this describes the scheme for funding sponsors in the first instance, it has no bearing on whether any judgment in this action would come from the state treasury.

As for Shalva's request that the Court grant declaratory relief, this too, is barred by the Eleventh Amendment because Shalva has not asserted a continuing violation of federal law.  Absent a continuing violation, the Eleventh Amendment bars a federal court from granting declaratory relief against a state based on past unlawful conduct.  Green v. Monsour, 474 U.S. 64, 73 (1983); Marbley v. Bane, 57 F.3d 224, 232 (2d Cir. 1995) (holding that absent valid claims for prospective relief, "there was nothing left of [plaintiff's] case but a claim for retrospective declaratory judgment . . . .  Green forbids such a declaration . . . .").  Since the Eleventh Amendment bars declaratory relief, the Court does not reach the merits of Shalva's third and fourth claims.

VI. Claim Five: Article 78 Claim Against State Defendants

Shalva has asserted a claim against State defendants under Article 78 that the NYSED's decision to terminate Shalva was "arbitrary and capricious."  (Am Compl. ¶¶ 100-102.)  The Eleventh Amendment bars this state law claim.[19]  Ex Parte Young's exception applies only to

---

[18] "FNS shall make available any remaining Program funds due within 45 days of the receipt of valid claims for reimbursement from sponsors by the State agency.  However, no payment shall be made for claims submitted later than 60 days after the month covered by the claim unless an exception is granted by FNS."

[19] Shalva's Article 78 claim is barred for the additional reason that Ex Parte Young only permits prospective relief, whereas Shalva's claim requests an injunction that requires retrospective payments.

alleged violations of federal law, not to actions asserted under state law alone.  Papasan v. Allain, 478 U.S. 265, 277 (1986); Pennhurst, 465 U.S. at 106.  Even if, as Shalva contends, its state claim were properly brought within the Court's supplemental jurisdiction,[20] Eleventh Amendment immunity nonetheless bars the claim.  Pennhurst, 465 U.S. at 120-21.

Although the Pennhurst bar does not extend to state law claims that can be construed as federal claims, Shalva's Article 78 claim does not state a substantial federal question.  An Article 78 proceeding is a vehicle for challenging agency action as, inter alia, "arbitrary and capricious," which means lacking any "sound basis in reason."  Pell v. Board of Ed., 356 N.Y.S.2d 833, 839 (1974).  Here, an Article 78 proceeding would determine whether the NYSED had a basis for terminating Shalva from the SFSP based on the criteria contained in the eligibility regulations.  Such a determination is a fact-specific application that does not implicate the validity or constitutionality of the regulations themselves.  Bldg. Indus. Elec. Contrs. Ass'n v. City of New York, 2011 U.S. Dist. LEXIS 86759, at *39 (S.D.N.Y. 2011) ("An Article 78 proceeding is the proper vehicle to determine whether the law has been lawfully applied, or the validity of certain government acts pursuant to a valid statute, rather than a vehicle for challenging the validity of a statute itself.").  Thus any relief granted in an Article 78 proceeding would necessarily be specific to Shalva, without any effect on broader or federal interests.  The state courts are more than competent to interpret federal regulations in the process of evaluating agency decisions; it is not apparent why a federal forum is necessary.

A state law cause of action that requires the interpretation of a federal regulation, by itself, is not sufficiently "substantial" to create federal jurisdiction.  Eugene Iovine v. City of New York, 1998 U.S. Dist. LEXIS 20420, at *8 (S.D.N.Y. 1999).  If the Court were to conclude

---

[20] It is not because Shalva's federal claims have been dismissed.

that the mere interpretation of 225.11(c) were sufficient to create independent federal jurisdiction, this would bring many routine Article 78 claims into the federal forum, which would be inappropriate as Article 78 is traditionally a state procedural remedy. Birmingham v. Ogden, 70 F. Supp. 2d 353, 372 (S.D.N.Y. 1999) (noting that Article 78 is a "novel and special creation of state law" and a "purely state procedural remedy"). Accordingly, Shalva's fifth claim is dismissed.

## CONCLUSION

For the foregoing reasons, the state Defendants' motion to dismiss is GRANTED and the federal Defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment and close this case.

Dated:  New York, New York
       March  1,  2013

                                                    SO ORDERED

                                                    _____

                                                    PAUL A. CROTTY
                                                    United States District Judge

24